# EXHIBIT A

FACSIMILE
(858) 551-1232

**BLUMENTHAL, NORDREHAUG & BHOWMIK**
2255 CALLE CLARA
LA JOLLA, CALIFORNIA 92037
GENERAL E-MAIL: bam@bamlawlj.com
Web Site: www.bamlawca.com

TELEPHONES
(858) 551-1223

WRITERS E-MAIL:
AJ@bamlawlj.com

WRITERS EXT:
3

March 16, 2012
IA109, IA110, IA111

**VIA UNITED STATES AND ELECTRONIC MAIL**

Jack Scholkoff
400 South Hope Street, Suite 1200
Los Angeles, CA 90071
Telephone: 213.438.1281
<Jack.Sholkoff@ogletreedeakins.com>

Re: *Poublon, Siward, and Scheele v. C.H. Robinson,*

Dear Jack:

I write to demand that Lorrie Poublon, Juliana Siward, and Kendall Scheele ("Plaintiffs") and Defendants CH Robinson Company and CH Robinson Worldwide, Inc. ("Defendants") participate in a mediation pursuant to the Dispute Resolution clause contained in the Bonus Incentive Agreement signed by Plaintiffs. The Plaintiffs bring claims on behalf of themselves for the following causes of action: 1. Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200, et seq.;[1] 2. Failure to Pay Overtime Compensation in Violation of Cal. Lab. Code §§ 510, 1194 and 1198, et Seq.; 3. Failure to Provide Accurate Itemized Statements in Violation of Cal. Lab. Code § 226; 4. Failure to Provide Wages When Due in Violation of Cal. Lab. Code § 203; and, 5. Failure to Pay Overtime Compensation in Violation of 29 U.S.C. §§ 201 et. seq..

Plaintiffs propose that we select Mr. Robert Coviello, Esq., who is already familiar with the factual and legal issues in this kind of case. Please confirm your selection of Mr. Coviello or provide us with a list of mediators that are acceptable to Defendants.

Once we have agreed on a mediator, then we can continue the mediation process in accordance with the instructions outlined in the Defendants' Employment Dispute Mediation Procedure.

---

1. Plaintiffs allege that as a predicate act for the UCL violation Defendants have engaged and continue to engage in a business practice which violates California law, including but not limited to, Wage Order 4-2001, the California Code of Regulations, and the California Labor Code Sections 201, 202, 203, 226(a), 226.7, 510, 1194 & 1198, and for which Plaintiffs will seek declaratory and other equitable relief pursuant to Cal. Bus. & Prof. Code § 17203.

Please also confirm that Defendants agree that this demand for mediation will toll the statute of limitations for all of Plaintiffs' claims that may be asserted against Defendants. Absent this confirmation, we will have no option but to file an action on their behalf in Court forthwith.

Sincerely,

Aparajit Bhowmik, Esq.
BLUMENTHAL, NORDREHAUG & BHOWMIK

K:\D\NBB\CH Robinson - Poublon - Siward - Scheele\l-def-01.wpd

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LORRIE POUBLON, an individual, ) Case No.
on behalf of herself, and on ) CV12-06654 CAS(MANx)
behalf of all persons similarly) Pages 1 - 95
situated, )
Plaintiff, )
vs. )
C.H. ROBINSON COMPANY; C.H. )
ROBINSON WORLDWIDE, INC., et )
al., )
Defendants. )
_______________________________)

CERTIFIED COPY

DEPOSITION OF GERRY NELSON

THURSDAY, OCTOBER 18, 2012

10:05 A.M.

Reported by:

ASHALA TYLOR, CLR, CRR, RPR

CERTIFIED SHORTHAND REPORTER #2436

Do you see that passage?
A Yes.
Q So is signing the bonus incentive agreement also a prerequisite for the employee to continue to be employed by C.H. Robinson?
MR. SHOLKOFF: Objection, beyond the scope of the 30 (b)(6) notice, calls for a legal conclusion, calls for speculation and lacks foundation.
You can answer.
THE WITNESS: It is my understanding that the bonus incentive agreement is required to be signed in order to receive your bonus advance.
BY MR. BHOWMIK:
Q I understand that. I was asking you a different question.
My question was: Is it also required in order to continue to be employed at the company, putting aside the bonus?
MR. SHOLKOFF: Objection, beyond the scope of the 30 (b)(6) notice, calls for a legal conclusion, lacks foundation, calls for speculation.
You can answer.
THE WITNESS: Not that I'm aware of.
BY MR. BHOWMIK:
Q At your branch has there ever been an employee

(Exhibit Number 5 was marked for identification and attached hereto.)

BY MR. BHOWMIK:

Q Okay. What I just handed to you as Exhibit 5, is a bonus -- Incentive Bonus Agreement, Bates numbered 027 to 31. Is this the bonus incentive agreement you presented to Miss Poublon?

A Yes.

Q And is that your signature on the first page of the exhibit in the lower right-hand corner?

A Yes.

Q And do you recognize that as Miss Poublon's signature in the lower left-hand corner?

A Yes.

Q And when did you present this BIA to her?

MR. SHOLKOFF: Objection, vague and ambiguous.

You can answer.

THE WITNESS: Based on my calendar, I presented it to her on December 20th.

BY MR. BHOWMIK:

Q Why do you say that? What do you mean based on your calendar?

A When I schedule compensation discussions I put them in my calendar. And in my calendar, her compensation discussion was scheduled for December 20th

or 21st. I can't be for sure of the dates. It's the 20th or 21st.

Q And is this calendar a document you reviewed recently in preparation for today's deposition?

MR. SHOLKOFF: Objection, to the extent it calls for attorney-client privilege.

You can answer.

THE WITNESS: Yes.

BY MR. BHOWMIK:

Q And where was the meeting held?

A In my office.

Q How long did the meeting last?

A I don't recall.

Q How long do your meetings usually last? Estimate.

MR. SHOLKOFF: Objection, vague and ambiguous, asked and answered.

You can answer.

THE WITNESS: 45 minutes.

BY MR. BHOWMIK:

Q 45 minutes?

A Roughly.

Q So longer than a half an hour, shorter than an hour?

MR. SHOLKOFF: Objection, asked and answered.

You can answer.

THE WITNESS: In general, yes.

BY MR. BHOWMIK:

Q And what are the topics of conversation that you covered during these meetings, or what are the topics of conversation that you covered during the meeting with Miss Poublon?

A With Laurie I discussed her compensation for the following year. I discussed her objective bonuses and spelled them out to her as to what she would be agreeing to in order to receive objective bonus.

I asked if she had any questions in regards to what I presented her and what is there. And then I gave her the document that she was going to take home, review, discuss with her -- I believe she said she was going to discuss with her husband. And that was the extent of the meeting.

BY MR. BHOWMIK:

Q So what did you discuss with her with regard to the compensation she'd receive the following year?

A On the second page of the document is a total list of the total target compensation. And we discussed where we are if we -- where we were projected for 2011, where we were planned at -- at the next year at flat for 2012, and if we hit goal at 2012 what that meant for her

eligible for bonus or other -- and/or other individual objectives," end of that sentence.

BY MR. BHOWMIK:

Q And is there a line item for the objective bonus on page 2 of the exhibit?

A Yes.

Q And would that be the objective bonus line item under the bullet "Individualized Compensation"?

A Yes.

Q Okay. So if that hit the highest goal that would have been $7,000, correct?

A If she hit the highest goal, yes.

Q If she individually hit the highest goal it would have been $7,000, right?

A Correct.

Q And she had to sign this bonus incentive agreement in order to receive that bonus as well, correct?

MR. SHOLKOFF: Objection, beyond the scope of the 30 (b)(6) notice.

You can answer.

It calls for a legal conclusion.

THE WITNESS: That I'm not sure.

BY MR. BHOWMIK:

Q Well, you said earlier that she -- I think we

agreed that she had to sign this document in order to receive bonuses, right?

MR. SHOLKOFF: Objection, his testimony speaks for itself.

You can answer.

THE WITNESS: To receive the financial bonus that's spelled out in line 4 as part of the incentive bonus agreement, yes.

BY MR. BHOWMIK:

Q But as we sit here today, you're not able to testify one way or another whether it was also a prerequisite to receiving the objective bonus? Is that a fair statement?

MR. SHOLKOFF: Objection, beyond the scope of the 30 (b)(6) bonus.

You can answer.

THE WITNESS: That is correct.

BY MR. BHOWMIK:

Q Did she ask you that?

MR. SHOLKOFF: Objection.

BY MR. BHOWMIK:

Q Did she ask you that during the meeting?

A No.

Q Did you explain to her during the meeting that she had to sign this document in order to receive

bonuses the following year?

MR. SHOLKOFF: Objection, vague and ambiguous.

You can answer.

THE WITNESS: I explained to her within our dialogue that, yes -- the dialogue went beyond just the meeting. So, yes, I explained to her that it was -- in order to receive the bonus it would need to be signed and back to corporate by a specific date.

BY MR. BHOWMIK:

Q What was that date?

A December 22nd.

Q And when you made that representation to her you did not differentiate -- when you said bonus, "You have to sign in order to get the bonus," you didn't differentiate between the objective bonus and the financial bonus, correct?

A I did not differentiate between the objective and the financial.

Q Now, when you said that the dialogue went beyond the meeting, is that what you said?

A Yes.

Q Okay. What did you mean by that?

A We had follow up in regards to via e-mail that stated that we needed to have the incentive bonus agreement back to corporate by a certain date in order

IBA. I just want to make sure we're talking about. It's the IBA.

Q We have been calling it BIA.

A I just caught that. It's not that big of a deal.

In regards to the incentive bonus agreement when she left with it, part of that was, "If you have any questions, please come back to me and we'll discuss those questions."

Q Okay. And so is it a fair statement that in the meeting that you had with her, you didn't have any discussion with her about the dispute resolution clause that's in the BIA?

A I did not have specific conversation about the dispute resolution as she did not ask any questions about the dispute resolution.

Q Well, you didn't have any general discussion with her about the dispute resolution clause either during the meeting, correct?

A I had general discussion about the incentive bonus agreement and the compensation and allowed her to ask questions as well as take the document home and then come back with questions if needed.

Q I appreciate that. But I'm asking a different question.

You said you didn't have any specific discussion with her about the dispute resolution clause that's in the BIA at paragraph 7. My question is did you have any general discussion with her about the dispute resolution clause at paragraph 7 in the BIA during the meeting?

A. I did not have general discussion about clause 7.

Q Okay. So the first sentence of paragraph 7 states:

"You and the company agree that acceptance provided below all claims the company might bring against you and all claims you might bring against the company and/or any of its officers, directors or employees shall be deemed waived unless submitted to mediation. Then if mediation is unsuccessful, the final binding arbitration in accordance with the employment arbitration rules in mediation procedures of the American Arbitration Association."

Do you see that portion of paragraph 7?

A Yes.

MR. BHOWMIK: Yes, correct. Thank you.
THE WITNESS: No.
BY MR. BHOWMIK:
Q Did you offer to her the ability to negotiate any of the terms in the BIA?
MR. SHOLKOFF: Objection. It's -- the question is vague and ambiguous.
You can answer.
THE WITNESS: The only part of the incentive bonus agreement that is adjustable, to my knowledge, is the financial performance bonus advance that is part of our discussion.
BY MR. BHOWMIK:
Q Okay.
A The dollar amount.
Q Got it. So other than that amount that you stated, you don't have the ability to modify any of the other terms in the BIA, just to be clear?
MR. SHOLKOFF: He personally? You said "you."
MR. BHOWMIK: Yes.
THE WITNESS: No.
(Exhibit Number 6 was marked for identification and attached hereto.)
BY MR. BHOWMIK:
Q All right. Handing to you a document marked

Q And other than your attorneys who else have you spoken to with regard to today's deposition, if anybody?

A My boss knows I'm coming to a deposition and does not know who it's for or what it's for.

Q Okay. After you gave the BIA to Miss Poublon to take home, what was the next thing that happened with regard to the BIA?

MR. SHOLKOFF: Objection, vague and ambiguous.

THE WITNESS: After she took it home I -- her and I had a meeting with Monster. And I followed up with a e-mail regarding that -- regarding that meeting as well -- or call -- as well as a discussion of the timeline of which this is due as well as giving her that $2,000 we discussed. All of that was part of that earlier discussion.

Q And then what happened?

MR. SHOLKOFF: Objection, vague and ambiguous.

THE WITNESS: Based on the timeline, I believe the next day she brought this in. We signed it and sent it to corporate.

BY MR. BHOWMIK:

Q What does that mean sending it to corporate?

MR. SHOLKOFF: You can answer.

THE WITNESS: I put it in a FedEx envelope and

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I, ASHALA TYLOR, CSR NO. 2436, IN AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

THAT, PRIOR TO BEING EXAMINED, THE WITNESS NAMED IN THE FOREGOING DEPOSITION WAS BY ME PLACED UNDER OATH TO TESTIFY TO THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH;

THAT SAID DEPOSITION WAS RECORDED STENOGRAPHICALLY BY ME AT THE TIME AND PLACE THEREIN NAMED AND THEREAFTER TRANSCRIBED, AND THE SAME IS A TRUE, CORRECT, AND COMPLETE TRANSCRIPT OF SAID PROCEEDINGS.

BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF THE TRANSCRIPT (X) WAS ( ) WAS NOT REQUESTED. IF REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED ARE APPENDED HERETO.

I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE EVENT OF THIS ACTION.

WITNESS MY HAND THIS 30TH DAY OF OCTOBER, 2012.

A. Tylor
ASHALA TYLOR, CSR NO. 2436

23124

(5)

# INCENTIVE BONUS AGREEMENT

This Incentive Bonus Agreement ("Agreement") is made by and between C.H. ROBINSON WORLDWIDE, INC., or one of its subsidiary or affiliated companies ("Company"), and Lorrie Ann Poublon ("You" or "Your"). In consideration for Your continued employment, Your eligibility for a bonus incentive, and the mutual promises set forth in this Agreement, You and the Company hereby agree as follows:

**1. Terms.**
Sections 5, 6, 7, and 8 of this Agreement shall be effective during and after Your employment with the Company. Sections 2, 3, and 4 of this Agreement shall be effective from 1/1/2012 through the end of the year, so long as You satisfactorily perform all of the duties of Your position. This includes Your ongoing compliance with all of the terms and conditions contained in any agreement(s) previously executed by you with the Company, the Company's Code of Conduct, and all other applicable rules, policies, laws, and/or regulation related to Your employment. If You move into a different position during the year, this Agreement may be modified or replaced. No bonus or bonus advance is considered earned by you or payable by Company if Your employment with the Company ends prior to December 31, 2012. However, in the event of Your death, Your beneficiary shall be paid the amount of salary and bonus accrued through the end of the month of Your death.

**2. Salary.**
You shall be paid a monthly salary of $ 3,666.67 as compensation for Your services. This will be paid semi-monthly.

**3. Bonus.**
You shall be eligible for a bonus based upon either annual financial performance measures and/or individual objectives. The amount of the bonus will be determined according to the Incentive Bonus Agreement Detail attached hereto. The bonus is earned on December 31, 2012, and is paid on or before the February 15 pay date of the following year.

**4. Financial Performance Bonus Advances.**
Beginning the first payday after the Effective Date, You will be paid a monthly advance on the financial performance bonus, in the amount of $ 791.67. The Company may, however, reduce the amount of bonus advances if at any time during the calendar year the Company determines that the projected financial performance of your assigned Financial Measures will be less than the amount required for You to earn the bonus already advanced, or to be advanced. Monthly bonus advances do not constitute salary, but are ordinary income for taxation purposes and will have all applicable federal, state and local taxes and other customary deductions from gross income deducted.

**5. Termination.**
Employment with the Company is "at-will." This means that You can terminate Your employment at any time. It also means that the Company can terminate Your employment, at any time, with or without notice or cause and/or change the terms and conditions of Your employment.

**6. Miscellaneous.**
This Agreement supersedes all previous Incentive Bonus Agreements or similar agreements entered into between you and the Company, which are hereby void.

**7. Dispute Resolution.**
You and the Company agree that, except as provided below, all Claims the Company might bring against You and all claims You might bring against the Company and/or any of its officers, directors, or employees shall be deemed waived unless submitted to mediation, then, if mediation is unsuccessful, to final and binding arbitration in accordance with the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association, modified as follows: (1) the arbitration need not actually be administered by the American Arbitration Association; (2) any mediation or arbitration shall be governed by the Company's Employment Dispute Mediation/Arbitration Procedure, which is available on the Company intranet; (3) dispositive motions shall be permissible and not disfavored in any arbitration, and the standard for deciding such motions shall be the same as under Rule 56 of the Federal Rules of Civil Procedure; (4) except on a substantial showing of good cause, discovery will be limited to the exchange of relevant documents and three depositions per side; and (5) except as mutually agreed at the time between You and the Company, neither You nor the Company may bring any Claim combined with or on behalf of any other person or entity, whether on a collective, representative, or class action basis or any other basis. In the case of any conflict between the rules and procedures for either mediation or arbitration, the priority and order of precedence shall be as follows: (1) the rules and procedures stated herein; (2) the Company's Employment Dispute Mediation/Arbitration Procedure; (3) the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association.

For purposes of this Agreement, "Claims" shall include, but not limited to, all claims directly or indirectly related to Your recruitment, employment, compensation or benefits (except that for any claims under an employee benefit or pension plan that specifies a claim procedure, such claim procedure must first be exhausted before a claim, if any, may be pursued under this Agreement) or termination of employment by the Company, including, but not limited to, alleged violations of Title VII of the Civil Rights Act of 1964, sections 1981 through 1996 of Title 42 of the United States Code and all amendments thereto, the Employee Retirement Income Security Act of 1974 ("ERISA"), the Americans with Disabilities Act of 1990 ("ADA"), the Age Discrimination in Employment Act of 1967 ("ADEA"), the Older Workers Benefits Protection Act of 1990 ("OWBPA"), the Fair Labor Standards Act ("FLSA"), the Occupational Safety and Health Act ("OSHA"), the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), and any and all claims under federal, state, and local laws or regulations (including all such laws and regulations pertaining to employment or prohibiting discrimination). This Dispute Resolution Agreement shall not apply to any of the following: (1) Worker's Compensation claims; (2) claims related to unemployment insurance; and (3) any claims by the Company that include a request for injunctive or equitable relief, including, without limitation, claims related to the enforcement of any restrictive covenants, non-competition obligations, non-solicitation obligations and/or confidential information provisions contained in any Company policy and/or employment agreement(s) entered into between You and the Company and/or any claims to protect the Company's trade secrets, confidential or proprietary information, trademarks, copyrights, patents, or other intellectual property.

This dispute resolution provision shall continue in full force and effect during Your entire employment with the Company and after Your employment has terminated, regardless of the reason for such termination and whether termination was voluntary or involuntary. This dispute resolution provision shall be binding upon the heirs, successors, and assigns of You and the Company, and any person or entity asserting Claims or seeking relief of any kind on behalf of You or the Company shall be bound by this Agreement to the fullest extent permitted by law.

If any portion of this dispute resolution provision is determined to be void or unenforceable, then the remaining portions of this Agreement shall continue in full force and effect, and this Agreement may be modified to the extent necessary, consistent with its fundamental purpose and intent, in order to make it enforceable.

**8. Governing Law and Venue Selection.**
This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Minnesota without regard to the conflicts of law principles. Any dispute or claim between You and the Company not subject to the requirements contained in Paragraph 7 shall be adjudicated or arbitrated exclusively in a state or federal court in Hennepin County, Minnesota, and both You and the Company consent to jurisdiction in such court, waive any objection to such venue, whether on the basis of inconvenience or otherwise, and agree not to pursue any claim or suit in any other jurisdiction.

YOU MAY WISH TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS AGREEMENT. HOWEVER, YOU WILL NOT BE ELIGIBLE TO RECEIVE ANY BONUS PAYMENTS OR ADVANCES UNTIL THIS AGREEMENT IS SIGNED AND RETURNED BY YOU. PLEASE READ THESE PROVISIONS CAREFULLY. BY SIGNING BELOW, YOU ARE ATTESTING THAT YOU HAVE READ AND UNDERSTOOD THIS DOCUMENT, AND ARE KNOWINGLY AND VOLUNTARILY AGREEING TO ITS TERMS.

The Effective Date of this Agreement is Sunday, January 01, 2012.

I understand and acknowledge that this Agreement and the benefits made available to me under this Agreement is part of the compensation and consideration available to me in return for the dispute resolution provision it contains and also the other various agreements I previously have entered into with Company, which agreements may include, but are not limited to, Sales-Employee Agreement, Management-Employee Agreement, Confidentiality and Noncompetition Agreement, and Data Security Agreement. I reaffirm and agree anew to abide by all my prior agreements with Company as a necessary condition of receiving the benefits under this Agreement.

| | | | |
|---|---|---|---|
| Lorrie Ann Poublon, 23124 | Date 12/23/11 | Gerry Nelson | Date 12-23-11 |



PENGAD 800-631-6989
DEPOSITION EXHIBIT 5
10-16-12
Nelson

CH-POU0000027

EXHIBIT B, PAGE 17

# Poublon,Lorrie Ann
## 2012 Compensation Summary

C.H. ROBINSON WORLDWIDE, INC.

Poublon,Lorrie Ann
Target Total Compensation *

| | Earned 2010 | Planned At Flat 2011 | Planned At Goal 2011 | Projected 2011 | Planned At 3^ (Flat) 2012 | Planned At 7 (Goal) 2012 |
|---|---|---|---|---|---|---|
| Annualized Salary | $ 44,000.00 | $ 44,000.00 | $ 44,000.00 | $ 44,000.00 | $ 44,000.00 | $ 44,000.00 |
| Team Based Compensation | | | | | | |
| Financial Bonus | $ 12,084.48 | $ 13,000.00 | $ 17,000.00 | $ 12,000.00 | $ 11,000.00 | $ 15,000.00 |
| Individualized Compensation | | | | | | |
| Objective Bonus | $ 3,812.71 | $ 5,000.00 | $ 5,000.00 | $ 957.25 | $ 7,000.00 | $ 7,000.00 |
| Total Cash | $ 59,897.19 | $ 62,000.00 | $ 66,000.00 | $ 56,957.25 | $ 62,000.00 | $ 66,000.00 |
| Wealth Accumulation | | | | | | |
| Proj. 401k Plan Match | $ 2,403.12 | $ 2,480.00 | $ 2,640.00 | $ 2,278.29 | $ 2,480.00 | $ 2,640.00 |
| Est. Profit Sharing | $ 2,403.05 | $ 2,480.00 | $ 2,640.00 | $ 2,278.29 | $ 2,480.00 | $ 2,640.00 |
| | $ 4,806.17 | $ 4,960.00 | $ 5,280.00 | $ 4,556.58 | $ 4,960.00 | $ 5,280.00 |
| Health and Welfare | | | | | | |
| Medical | $ 9,552.00 | $ 10,014.00 | $ 10,014.00 | $ 10,014.00 | $ 10,800.00 | $ 10,800.00 |
| Dental | $ 84.00 | $ 54.00 | $ 54.00 | $ 54.00 | $ 90.00 | $ 90.00 |
| LTD | $ 75.12 | $ 41.70 | $ 41.70 | $ 41.76 | $ 41.70 | $ 41.70 |
| Life | $ 39.12 | $ 22.32 | $ 23.76 | $ 20.50 | $ 22.32 | $ 23.76 |
| | $ 9,750.24 | $ 10,132.02 | $ 10,133.46 | $ 10,130.26 | $ 10,954.02 | $ 10,955.46 |
| Total Compensation * | $ 74,453.60 | $ 77,092.02 | $ 81,413.46 | $ 71,644.09 | $ 77,914.02 | $ 82,235.48 |

| Payroll | Year-End 2010 | Planned 2011 | Projected 2011 | Current 2011 | Planned 2012 |
|---|---|---|---|---|---|
| Annualized Salary | $ 44,000.00 | $ 44,000.00 | | $ 44,000.00 | $ 44,000.00 |
| Advance | $ 10,999.92 | $ 11,000.00 | $ 10,999.92 | $ 10,999.92 | $ 9,500.00 |
| Total | $ 54,999.92 | $ 55,000.00 | | $ 54,999.92 | $ 53,500.00 |
| Per Pay Period Total | $ 2,291.66 | $ 2,291.67 | | $ 2,291.66 | $ 2,229.17 |

2012 401k Contribution: 4%
2012 Company 401k Match: 4%
Max 401k Match: 4%
Match Loss: 0%

Est. Profit Sharing Contribution: 4%
Eligibility Date for Profit Sharing: 7/1/2008

Employee ID: 23124
Branch: 0638, Los Angeles Global Forwarding
Most Recent Hire Date: 5/7/2007

^ Planning based on the projected 2011 year-end finish

Poublon,Lorrie Ann
Financials - GN Revenue - LOS ANGELES GF Rollup

| | 2 | 3^ | 4 | 5 | 6 | 7 (GOAL) | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| GN Revenue | $ 1.00 | $ 1.00 | $ 40,617.77 | $ 81,234.57 | $ 121,851.35 | $ 162,468.12 | $ 203,084.89 | $ 243,701.69 |
| GN Growth %ages | 0.00% | 0.00% | 4061677.25% | 8123358.50% | 12185034.75% | 16246712.00% | 20308389.25% | 24370068.50% |
| Planned GN Bonus | $ 10,500.00 | $ 11,000.00 | $ 12,000.00 | $ 13,000.00 | $ 14,000.00 | $ 15,000.00 | $ 15,500.00 | $ 16,000.00 |
| Planned FIN Bonus % Change | -12.50% | -8.33% | 0.00% | 8.33% | 16.67% | 25.00% | 29.17% | 33.33% |

* For each decrease of $ 100,000.00 below $ 1.00, bonus decreases by $ 0.00

* For each increase of $ 100,000.00 above $ 243,701.69, bonus increases by $ 250.00

Poublon,Lorrie Ann
Planned Total Cash +

| | 2 | 3^ | 4 | 5 | 6 | 7 (GOAL) | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| Planned Total Cash | $ 61,500.00 | $ 62,000.00 | $ 63,000.00 | $ 64,000.00 | $ 65,000.00 | $ 66,000.00 | $ 66,500.00 | $ 67,000.00 |
| Total Cash % Change | 7.98% | 8.85% | 10.61% | 12.36% | 14.12% | 15.88% | 16.75% | 17.63% |

Historical Financial Information

| YEAR | MEASURE POINT DESCR | MEASURE TYPE | FINANCIALS | % CHG FROM PRIOR YEAR |
|---|---|---|---|---|
| 2011 | LOS ANGELES GF Rollup | GN_REVENUE | $ -354,242.83 | -287.35% |
| 2010 | LOS ANGELES GF Rollup | GN_REVENUE | $ 189,082.78 | -44.63% |
| 2009 | LOS ANGELES GF Rollup | GN_REVENUE | $ 341,483.16 | |

* Growth: For each increase of $ 100,000.00 in Gross Net Revenue growth beyond $ 243,701.69, you will earn an additional $ 250.00. Down: For each decrease of $ 100,000.00 in Gross Net Revenue below $ 1.00, your bonus opportunity will decrease by $ 0.00. At no time will bonuses decrease below zero amount. For final Gross Net Revenue results which fall between those displayed, bonus amount will be prorated between the two Gross Net Revenue measures. Amounts are not cumulative.

+ Planned Total Cash is the sum of base salary, financial bonus, objective bonus, and commissions. Objective and Commission at 3(Flat) are reflected up to and included in Bracket 6. Objective and Commission at 7(Goal) are included at the Goal Bracket and above.

^ Planning based on the projected 2011 year-end finish

**Poublon,Lorrie Ann**
**Individual Objectives Summary**

| | Weighting | Comment |
|---|---|---|
| Objective 1 | 50% | Lorrie will receive 5% of Net Revenue for any new account she personally brings in or closes, along with continuing to receive 5% of Dial/Henkel, Broco and Traffix Devices (Ocean and Air Export only on the latter) |
| Objective 2 | 25% | 400 Buy rate Code entered prior to departure to equal above 50% 1st Qtr, above 60% 2nd Qtr, and above 65% 3rd and 4th quarter as a team. Paid in equal quarterly installments. |
| Objective 3 | 25% | 400 Sell rate Code entered prior to departure to equal above 50% 1st Qtr, above 60% 2nd Qtr, and above 70% for 3rd Qtr and above 80% for 4th quarter as a team. Paid in equal quarterly installments. |

## 2012 Total Cash at Goal




## 2012 Total Compensation* at Goal






* All amounts shown are estimates.
Printed: 12/12/2011 12:51:34 PM

CH-POU0000031

EXHIBIT B PAGE 21